UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**DARRYL PETLOCK,**

        **Plaintiff,**

  v.

**BARRY NADROWSKI, WARDEN M.C.C.I., et al.,**

        **Defendants.**

Civil Action No. 16-310 (FLW)

**OPINION**

This matter has been opened to the Court by a motion to dismiss brought by Warden Barry Nadrowski ("Warden Nadrowski"), Sheriff Shaun Golden ("Sheriff Golden"), and the County of Monmouth ("County") (collectively referred to as "Defendants"). Defendants seek dismissal of Plaintiff Darryl Petlock's Second Amended Complaint ("SAC"), which asserts claims for relief pursuant to 42 U.S.C. § 1983 in connection with his pretrial detention in protective custody at Monmouth County Correctional Institution ("MCCI"). ECF Nos. 91, 121. For the reasons explained in this Opinion, the motion to dismiss the SAC is granted, and Plaintiff's request for counsel is denied in light of the dismissal of the SAC.

I.    **PROCEDURAL AND FACTUAL BACKGROUND**

    a.  **PROCEDURAL HISTORY**

Petlock's initial Complaint was filed on January 13, 2016. ECF No. 1. His civil rights claims arise from his pretrial detention at MCCI on murder and related charges. On February 1, 2016, Plaintiff submitted an Amended Complaint. *See* ECF No. 2-4.

On December 8, 2016, the Court proceeded the Amended Complaint in part and dismissed it in part pursuant to the Court's screening authority under 28 U.S.C. § 1915(e)(2)(B).

*See* ECF Nos. 15-16.  The Court declined to dismiss at screening Plaintiff's Fourteenth Amendment conditions-of-confinement claims, ECF No. 15 at 14, Fourth Amendment claims related to harassing searches of Plaintiff and his cell, *id.* at 14–16, Sixth Amendment claims regarding denial of access to Plaintiff's criminal attorney, "class of one" equal protection claim, and First Amendment claim of denial of access to the courts in relation to his state criminal proceedings.  *See* ECF No. 15 at 16–18, 19–21.

The Court dismissed without prejudice Plaintiff's access to the courts claims related to (1) his 2013 divorce/custody proceeding, (2) his 2015 civil cases, and (3) the federal detainer. The Court also dismissed without prejudice Plaintiff's claims for injunctive relief as moot due to his transfer from MCCI.  Finally, the Court dismissed without prejudice Plaintiff's claims for compensatory damages without prejudice for failure to meet the actual injury requirement as required by § 1997e(e).  ECF No. 15 at 21–27; ECF No. 16 at 1–2.

The Court provided leave for Plaintiff to file a second amended complaint within 30 days "to the extent [he] can provide facts that would cure the deficiencies as to those claims dismissed without prejudice" and to include "new allegations of misconduct referred to in his May 3, 2016 letter."[1]  ECF No. 16 at 2.

Plaintiff did not file a second amended complaint within that 30-day period but did file other submissions with the Court.  *See* ECF Nos. 24, 25, 28.  On April 10, 2017, Defendants filed an Answer to the First Amended Complaint.  ECF No. 26.  On June 26, 2017, Plaintiff filed a motion to "alter or amend the judgment, or to reconsider" the Court's screening Opinion and

---

[1] The letter referenced alleged threats by corrections officers that occurred after the complaint was filed.

Order of December 8, 2016, ECF No. 29, which the Court denied as untimely.  ECF No. 50 at 3-4.

On July 27, 2018, Plaintiff filed what he titled a "motion for leave to file an amended complaint."  ECF No. 70.  Despite that title, Plaintiff's brief asked the Court to reconsider the Memorandum and Order that denied his prior motion for reconsideration.  On February 28, 2019, the Court denied Plaintiff's request for reconsideration and provided Plaintiff with 60 days to file a motion for leave to file a second amended complaint.  *See* ECF No. 87.

On April 18, 2019, Plaintiff filed a motion for leave to submit a second amended complaint, including his SAC.  ECF Nos. 91-6.  On July 1, 2019, the Defendants filed opposition to the motion to amend and a cross motion to dismiss the Amended Complaint.  *See* ECF No. 98.  The Magistrate Judge administratively terminated the matter pending status updates regarding the pending criminal state charges against Plaintiff. ECF Nos. 105-107.  On January 8, 2020, the Magistrate Judge reinstated Plaintiff's motion to amend and the Defendants opposition and cross motion to dismiss the Amended Complaint.  *See* ECF No. 116.

Meanwhile, on April 29, 2019, Plaintiff pleaded guilty in Monmouth County to aggravated manslaughter with a recommended sentence of thirteen (13) years with an eighty-five percent (85%) period of parole ineligibility, to run concurrently with a sentence to be imposed for a violation of supervised release by the United States District Court for the District of New Jersey. *See* Crim Act. No. 12-623 at ECF No. 28-1, Plea Hearing Tr. Apr. 29, 2019.  On November 22, 2019, Plaintiff entered a new plea to second degree aggravated manslaughter pursuant to N.J.S.A. 2C:11-4(a), and was sentenced to an eight-year term of incarceration, subject to the No Early Release Act ("NERA").  *See id.*, ECF No. 28-2, State Court Judgment of Conviction ("State Court JOC"); ECF No. 28-3, Plea Hearing Tr. Nov. 22, 2019.

Subsequently, on February 25, 2020, Plaintiff's federal supervised release was revoked and he was sentenced to a term of 60 months.  *See* Crim Act. No. 12-623 at ECF No. 31.

On August 14, 2020, the Court granted in part and denied in part Plaintiff's motion to amend, ECF No. 91, and directed the Clerk of the Court to file the SAC and add the County of Monmouth to the docket as a Defendant.[2]  *See* ECF No. 118.  The Court also denied Defendants' cross-motion to dismiss the Amended Complaint as moot.  Defendants Barry Nadrowski, Shaun Golden, and the County of Monmouth ("Defendants") subsequently filed a motion to dismiss the SAC on September 16, 2020.  *See* ECF No. 122.

Plaintiff wrote to the Court seeking a stay and/or an extension of time within which to file his brief opposing Defendants' motion to dismiss, citing his imminent transfer to the Bureau of Prisons, the COVID-19 lockdown, and his pending appeal of the sentence imposed in connection with his federal violation of supervised release ("VOSR").  *See* ECF Nos. 122, 126.  The Court provided Plaintiff with two extensions of time; the Court's latter Order was issued on October 22, 2020, and it provided that Plaintiff's opposition brief was due on December 18, 2020.  ECF Nos. 125-127.

Plaintiff did not file his opposition brief as instructed by the Court, but he did file a notice of change of address, indicating that he was transferred on November 23, 2020 to FCI Schuykill; Plaintiff submitted a second notice of change of address, stating that he was not permitted to bring his legal papers when he was transferred.  *See* ECF No. 18-128.  On January 21, 2021, Plaintiff submitted another letter asking for a copy of the docket sheet.  ECF No. 130.  None of

---

[2] In addressing the motion to amend, the Court addressed <u>only the limited arguments raised by Defendants</u> in opposition to Plaintiff's motion to amend. That is, the Court did not screen the SAC for dismissal pursuant to 28 U.S.C. § 1915(e) or otherwise assess all the claims alleged in the SAC.  Instead, the Court permitted Defendants to move to dismiss the SAC, if appropriate.

4

Plaintiff's letter submissions referred to the Court's October 22, 2020 Order directing Plaintiff to file his opposition by December 18, 2020.

On April 29, 2021, the Court terminated the motion to dismiss and ordered supplemental briefing on the issue of whether Defendants Nadrowski and Golden are entitled to qualified immunity on Plaintiff's § 1983 claims for damages in their personal capacities.  In light Plaintiff's pro se status and his transfers, the Court also provided Plaintiff with a <u>final opportunity</u> to oppose Defendants' motion to dismiss the SAC.

Plaintiff wrote to the Court on May 17, 2021, prior to Defendants' supplemental briefing deadline, to request counsel, citing his lack of legal knowledge as well as lockdowns and his difficulties obtaining legal assistance due to the COVID-19 pandemic.  *See* ECF No. 132. Defendants filed their supplemental briefing on May 27, 2021.  ECF No. 133.  To date, Plaintiff has not filed a substantive opposition brief to the motion to dismiss, and the Court addresses his request for counsel below.

### b.  The Second Amended Complaint

Plaintiff's SAC asserts § 1983 claims against Nadrowski, Golden, and the County.  *See* SAC, ECF No. 91-6.  According to the SAC, Plaintiff was charged with first degree murder of an individual alleged to have been an informant for the Monmouth County Prosecutor's Office ("MCPO").  For this reason, and because Plaintiff allegedly dated an employee of the Monmouth County Sheriff's Office and allegedly socialized with Monmouth County correctional officers in the company of the murder victim, Plaintiff asked to be housed at a facility other than Monmouth County Correctional Facility "for his own safety."  *See* SAC at 2.  Although the MCPO allegedly denied his request for transfer, it sent letters to MCCI requesting that Plaintiff be placed in protective custody indefinitely until trial.  *Id.*  Plaintiff alleges in his SAC that that the MCPO

recommended he be placed in protective custody to punish him, *see id.*, but Plaintiff has not identified or sued the MCPO employees who allegedly sought to punish him by placing him in protective custody.

Plaintiff's alleges that "Warden Barry Nadrowski or his designee approved" his placement in protective custody.[3]  Plaintiff also alleges that "Defendants' stated position" was that he could not be removed from protective custody because the MCPO made a written request that he be placed in protective custody.  *See id.* at 3.  According to Plaintiff, his continued placement in protective custody was "automatic" due to the MCPO's recommendation, and the hearings provided could not offer relief.  *Id.*  Although Plaintiff alleges that he asked to be transferred to a different facility, Plaintiff does not allege in the SAC that he asked to be released from protective custody into the general population at MCCI, as he admittedly feared for his safety.

Plaintiff remained in protective custody at MCCI in "J Unit" from September 2012 to June 2016, until he was transferred to Mercer County Correctional Facility during the pendency of this litigation.  While in protective custody at MCCI, Plaintiff was housed in a single cell under 23-hour lockdown.  *Id.*  Other hardships in J-Unit allegedly included 24-hour illumination, frigid temperatures, and excessive noise from the television which blared from 7am to 11pm daily.  *Id.* at 4.  The inmates in J Unit also received their food in foam containers, whereas the inmates in general population receive their food in rubberized containers, which retain heat.  *Id.*  Plaintiff further alleges that inmates in protective custody are provided with only one jumpsuit

---

[3] There are no facts in the SAC to suggest that Sheriff Golden was involved in the decision to place Plaintiff in protective custody.

and are permitted a single twenty minute visit once a week between the hours of 1 p.m. and 3 p.m. on Fridays, which often prevents family and friends from visiting.  *Id.*

During the one-hour period outside his cell each day, Plaintiff was permitted to shower, clean his cell, or engage in recreation, but the recreation cage was allegedly too small to allow meaningful exercise.  Plaintiff alleges there is a secure area adjacent to J Unit with dog-style runs where inmates could exercise and that general population inmates have access to a weight room and basketball court.  *Id.* at 4-5.  Due to the lack of exercise, Plaintiff allegedly experienced atrophied muscles and other injuries, as well as high blood pressure.  *Id.* at 4-5.  Plaintiff generally alleges that "Defendants" were deliberately indifferent to his loss of health, which resulted from the recreation policies for inmates in protective custody.  *See id.* at 6.

Plaintiff also alleges that the policy for attorney phone calls in protective custody was cumbersome and resulted in delays.  Social workers at the jail processed inmates requests to speak to their attorneys by phone, and these requests could take one to two weeks to process.  *Id.* at 6-7.  Moreover, phone calls with Plaintiff's attorney must occur in the Restrictive Cage, which was not private.  *Id.* at 7.  Plaintiff alleges he was unable to prepare his defense under these circumstances.  *Id.*  According to the Complaint, Warden Nadrowski and Sheriff Golden "are fully aware and have approved the use of this 'restrictive cage'" for legal phone calls and attorney visits, as well as clergy visits and mental health visits.  *Id.* at 8.  The SAC also alleges that inmates in protective custody are generally prohibited from taking educational, rehabilitative, and religious programs.  *Id.* at 4, 9.

Plaintiff also alleges that there are insufficient law library slots for protective custody detainees.  For male detainees, there are four slots per week, and one inmate per slot for fifty minutes.  Moreover, Plaintiff contends that the law library hours in protective custody, which run

from Monday-Friday from 7am to 3pm, are insufficient, and that the law library in protective

custody lacks computers.  *Id.* at 11.  By comparison, the law library services in general

population are far better, and include expanded hours, access to a computer system, and inmate

paralegals.  *Id.*  Plaintiff alleges that he was not provided with paralegal services, legal copying

and printing services, or sufficient legal research materials, and that these deficiencies in library

access and materials also impeded his ability to prepare a defense in his criminal case.[4]  *See id.* at

15-16.

Plaintiff also alleges in the SAC that certain "policies" at MCCI applied <u>only to Plaintiff,</u>

and these policies were more restrictive than the policies that applied to other detainees in

protective custody and were created to harass him.  *See id.* at 9.

Plaintiff alleges that after he grieved the denial of his request to take educational

programs, a "Policy" was implemented that permitted Plaintiff to take two paralegal studies

courses.  Subsequently, staff at MCCI informed Plaintiff that all of his personal property was

gone, including his legal research, case notes, and records.  *Id.*  Plaintiff's eyeglasses also went

missing, and an unidentified individual told Plaintiff that if he decided not to go to school, his

glasses would be found and returned.  *Id.*  Because there was no process for replacing eyeglasses,

Plaintiff waited three months until his family member bought him new eyeglasses.  *Id.*

Plaintiff also alleges generally that "Defendants" created a "policy" stating that he was no

longer permitted to have private visits with his attorney and "[t]he Jails [sic] Staff told Plaintiff

that if he stopped attending school, he could have a private room to meet with his Attorney." *Id.*

at 10, 17.  According to Plaintiff, an unidentified individual informed Plaintiff that "per Policy"

---

[4] The Court denied the motion to amend with respect to Plaintiff's additional access to the courts
claims, and does not consider them here.

he would no longer be permitted to have private visits with his attorney. *Id.* at 17.  From September 2014 to September 2015, Plaintiff had to meet with his attorney in the Restrictive Cage.[5] *Id.* at 17.  Plaintiff's attorney requested to meet with the Warden, but that request was denied. *Id.*  Plaintiff's attorneys told the state court they could not effectively represent Plaintiff under these circumstances and attempted to resolve this matter with the state court but were unsuccessful. *Id.* at 17-18.  In addition, Plaintiff alleges generally that "Defendants" allowed their staff to open Plaintiff's legal mail. *Id.* at 18.

In September 2015, "Defendants" revised their "Policy" and permitted Plaintiff to use a classroom to meet with his attorney, and this classroom was available from Monday-Friday between the hours of 8:30am and 2pm. *Id.*  In order to meet with his attorney in the classroom, Plaintiff was required to submit to a strip search before and after his visits and is shackled in full body restraints so he could not use his hands. *Id.*  Plaintiff had to sit in a chair and was not permitted to approach his attorney. *Id.*  Plaintiff alleges that these restrictions were done maliciously and without penological justification to punish Plaintiff for his exercise of his constitutional rights. *See id.*  Plaintiff alleges that he was unable to review discovery or take notes due to this alleged policy. *See id.* at 19.  Plaintiff further alleges that he is only handcuffed at the Monmouth County Courthouse and is not shackled in this manner during law library visits or visits with family. *Id.*

Plaintiff further alleges that "Defendants" created a policy to search Plaintiff's cell every day and that staff was instructed to read Plaintiff's mail and search for incriminating evidence in his criminal case and for Plaintiff's work in this civil case. *Id.* at 10.  According to Plaintiff

---

[5] Earlier in the Complaint, Plaintiff appears to allege that all protective custody inmates had to meet with their attorneys in the restrictive cage.

"Staff used the searches to mix thousands of pages of Legal materials together repeatedly until Plaintiff got the point that The Defendants are in charge, and they further explained that all Plaintiff needed to do was stop playing Lawyer[.]" (Emphasis in original).  *Id.* at 11.

With respect to each alleged deprivation and act of misconduct, Plaintiff refers generally to "Defendants" and attempts to implicate Defendants Nadrowski and Golden through the following boilerplate allegations:

> Upon information and belief, Defendants Warden Barry Nadrowski and Sheriff Shaun Golden have either Created, Authorized or their designated agent has: The Rules, Procedures, Polices [sic], Memorandums, and Unofficial customs of Monmouth County Correctional Institution, as such they are aware of any omissions contained in them by Design or Fault.
>
> Furthermore, Warden Berry Nadrowski and Sheriff Golden have been informed of the alleged violations of Plaintiffs Constitutional Rights. Copies of all Grievances and related Appeals were sent to both of them. In addition, I did write both of the above individuals informing them of these violations, I requested that they investigate and take corrective measures. The Defendants did not do so.

*See id.* at 3, 5, 9, 11, 16-17; *see also* ECF No. 91-4, Attachment D (listing dates of grievances and stating that grievances were "appealed" to [W]arden Nadrowski").

As an exhibit to their motion to dismiss, Defendants provide a copy of the Monmouth County Sheriff's Office Policy and Procedures for protective custody ("The Policy"), which also addresses administrative and disciplinary segregation.  The stated purpose of the Policy "is to maintain a safe, secure and orderly facility."  *See* Exhibit A at 4.  Protective Custody is defined as follows:

> Shall mean confinement to a secure unit designated to restrict or limit an inmates activities and contacts with others, in order to provide protection to the inmate from injury or harm actually threatened or reasonably believed to exist based on events, investigative reports, informants' reports or other reliable sources of information.

The Policy and the regulations on which is based provide that the prosecutor may recommend in writing that an inmate be placed in protective custody.  *See* Exhibit A at 8; N.J.A.C. 10A:5-5.1. The Protective Custody Policy also provides that the Warden or his designee shall determine whether the inmate should be placed in protective custody.  *See id.*  With respect to voluntary or involuntary placements in protective custody, the Policy provides for reviews every 7 days for the first 2 months, and every 30 days thereafter; protective custody inmates are entitled to an in-person hearing after a year.  *See id.* at 9.   The Policy states that "[a]t the involuntary protective custody review the inmate shall be given the right to appear personally and shall be provided a written notice of the committee's decision."  *Id.* at 8.  Inmates in "voluntary protective custody" may sign a release form to return to the general population where the Institutional Classification Committee ("ICC") and the Warden are satisfied that there is no known danger to the inmate or his wellbeing.  Upon recommendation of the ICC, the Warden may release inmates in "involuntary protective custody" if the danger to the inmate's safety has abated and the inmate signs a release form.  *See id.*

The Policy provides that inmates in protective custody shall have visitation, laundry and linen services, mail services, telephone privileges, personal and reference legal materials, and reading materials.  *See id.* at 5-6.  The Policy also provides that inmates may have access to institutional services "upon request," including educational, religious guidance, library, and recreational services.  *Id.* at 7.  The Policy states, however, that "these activities are separate from the general population classes.  No outside the assigned classroom participation in any educational program or industry is authorize [sic]."  *Id.*

11

With respect to exercise, the Policy provides as follows: "Inmates in special management units receive a minimum of one hour of exercise per day outside their cells, five days per week, unless security or safety considerations dictate otherwise." *Id.* at 6.

The Policy states that inmates may not be deprived of authorized activities, and "[a] report shall be generated and forwarded to the Warden for any authorized item or activity that is deprived [sic] from the Inmate." *Id.* at 8.

## II.  <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That requires "plausibly suggesting" facts sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Courts, however, "disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).  Additionally, pro se pleadings are held to a less stringent standard than formal pleadings drafted by attorneys. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003).

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."[6] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  But where a document is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment"

---

[6] In resolving a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court can consider the allegations of the complaint as well as any "documents that are attached to or submitted with the complaint, ... any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (brackets in original).

under Rule 56. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("USciences")
(quoting *Burlington*, 114 F.3d at 1426).  Even where a document is integral to and explicitly
relied upon in the [C]omplaint, "consideration [of that document] only goes so far."  *Doe v.
Princeton University*, 30 F.4th 335, 34 (3d Cir. 2022).  Thus, when "the truth of facts in an
'integral' document are contested by the well-pleaded facts of a complaint, the facts in the
complaint must prevail." *Id.*

### III.   **DISCUSSION**

Plaintiff asserts his claims pursuant to § 1983 and raises First Amendment retaliation
claims, Fourteenth Amendment conditions of confinement and equal protection claims, First and
Fourteenth Amendment access to the court claims, and Sixth Amendment access to his attorney
claims.  Plaintiff brings these claims against Defendants Nadrowski and Golden in their
supervisory capacities.  In addition, Plaintiff has also sued the County of Mercer pursuant to
*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Defendants seek
dismissal of Plaintiff's SAC for failure to state a claim for relief and, alternately, on the basis of
qualified immunity.

### a.  **The Retaliatory and Discriminatory "Policies"**

The Court begins with Plaintiff's claims that the Defendants created purported "policies"
that targeted only Plaintiff (referred to herein as "retaliatory or discriminatory policies").  With
respect to this claim, the Court construes Plaintiff to allege claims of First Amendment
retaliation and Fourteenth Amendment class of one equal protection against Defendants
Nadrowski and Golden.

Retaliation against a prisoner based on his exercise of a constitutional right violates the
First Amendment.  *See Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (citing *Mitchell v.*

*Horn*, 318 F.3d 523, 529–31 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001); *Allah v. Seiverling*, 229 F.3d 220, 224–26 (3d Cir. 2000).  In order to state a prima facie case of First Amendment retaliation, a prisoner must assert that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Rauser v. Horn*, 241 F.3d at 333.  A prisoner's ability to file grievances and lawsuits against prison officials is a constitutionally protected activity for purposes of a retaliation claim.  *See Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981); *Mitchell v. Horn*, 318 F.3d at 530; *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court outlined the "class-of-one" theory of equal protection.  Under a "class-of-one" claim, a plaintiff asserts that he "has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment."  *Olech*, 528 U.S at 564.  To prove a "class-of-one" claim, a plaintiff must establish that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

In the SAC, Plaintiff alleges that various unidentified prison staff retaliated against him for seeking to take paralegal courses and for "playing lawyer."[7]  With respect to the retaliatory

---

[7] Plaintiff appears to allege that he has a right to take paralegal courses and that the unnamed staff members retaliated against him for doing so.  It is not clear that Plaintiff has a constitutional

policies, Plaintiff alleges that his request to take educational programs was initially denied and he grieved the denial of this request.  As a result, he was permitted to take two paralegal studies courses.  Subsequently, however, unnamed staff at MCCI informed Plaintiff that all of his personal property was gone, including his legal research, case notes, and records, and his eyeglasses.  Another unidentified individual told Plaintiff that if he decided not to go to school, his glasses would be found and returned.

Plaintiff was also allegedly denied private visits with his attorney, allegedly pursuant to a "policy" issued by "Defendants," which was directed only at him.  According to the SAC, jail staff told Plaintiff that he could have a private room if he stopped attending school.  Pursuant to a revised "policy," Plaintiff could meet with his attorney but had to submit to strip searches before and after the visits and was placed in full restraints during the visits.  Plaintiff also alleges that he was subjected to a "policy" whereby his cell was searched every day and staff was instructed to read Plaintiff's mail and search for incriminating evidence in his criminal case and for Plaintiff's work in this civil case.  During these searches, unnamed prison staff mixed up Plaintiff's legal papers, and the purported goal of these searches was to make Plaintiff stop "playing lawyer."

The Court noted in its prior screening decision that Plaintiff could bring claims against the unidentified jail staff who allegedly retaliated against him; however, Plaintiff's SAC does not bring such claims.  Instead, Plaintiff attempts to attribute this misconduct to Defendants Nadrowski and Golden by characterizing the adverse actions as policies created by "Defendants."

---

right to take paralegal courses, but the Court need not decide this issue because the claims fail against Nadrowski and Golden on the basis of personal involvement.

Individual Defendants Nadrowski and Golden contend that the SAC fails to provide sufficient facts showing that they were personally involved in any of the alleged retaliatory or discriminatory misconduct. The Court agrees. It is well-settled that *respondeat superior* is not a basis for section 1983 liability for supervisors, such as Defendants Nadrowski and Golden. As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved....") (internal quotations, citations omitted); *Innis v. Wilson*, 334 F. App'x 454, 457 (3d Cir. 2009) (indicating that section 1983 plaintiff could not maintain claim against individual defendant unless said defendant was personally involved in actions causing the claim).

There are two basic ways that a supervisors may be held liable under § 1983 – through direct participation or through policymaking. With respect to direct participation, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 586 (3d Cir. 2004); *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."). A supervisor-defendant may be also liable for unconstitutional acts undertaken by subordinates if the supervisor-defendant "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (alteration in original). Policy claims also have

16

specific pleading requirements.  "[T]o hold a supervisor liable...for their deficient policies...the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of [a constitutional] injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133–34 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)); see also *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 317 (3d Cir. 2014), rev'd on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015) (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989)).

Here, Plaintiff has not provided sufficient well-pleaded facts showing that Nadrowski and/or Golden created any "policies" that targeted Plaintiff personally.  His bald allegations that the misconduct committed by corrections staff resulted from policies issued by "Defendants" are conclusory and insufficient to state a claim for relief against Defendants as policymakers.[8]

Nor does Plaintiff sufficiently allege that Nadrowski and/or Golden were <u>directly involved</u> in the retaliatory conduct and/or intentional discrimination, as required to state a claim for relief under the direct participation framework.  In order to show personal involvement by

---

[8] Plaintiff's allegations that "Defendants" created the policies also borders on an impermissible group pleading.  *See e.g.*, *Ingris v. Borough of Caldwell*, No. 14–855, 2015 WL 3613499, at *5 (D.N.J. June 9, 2015) ("[T]o the extent Plaintiff seeks to lump several defendants together without setting forth what each particular defendant is alleged to have done, he has engaged in impermissibly vague group pleading.").  Group pleadings are generally improper because they do not satisfy the requirements of Federal Rule of Civil Procedure 8. *See Shaw v. Housing Auth. of Camden*, No. 11–4291, 2012 WL 3283402, at *2 (D.N.J. Aug. 10, 2012) (finding that "[e]ven under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants." (citation omitted) ).  This is necessary to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In other words, when defendants are grouped together, a court cannot determine whether a complaint has set forth plausible allegations as to each particular defendant.

Nadrowski and/or Golden, Plaintiff provide at least some well-pleaded facts showing that Nadrowski and/or Golden <u>directed</u> staff members to deny him access to paralegal courses, search his cell for purposes of harassment, take his property, perform excessive strip searches, or place him in restraints prior to his attorney visits in order to retaliate or discriminate against him. Alternatively, Defendants Nadrowski and/or Golden could be liable as supervisors if Plaintiff alleged that they had <u>contemporaneous knowledge</u> of the retaliatory and/or discriminatory incidents and failed to stop the misconduct.  Here, however, Plaintiff provides insufficient well-pleaded facts showing that Defendants Golden and/or Nadrowski directed any of the retaliatory or discriminatory conduct committed by the unidentified corrections staff or that Golden and/or Nadrowski had contemporaneous knowledge of the alleged wrongdoing and failed to correct it.

In this regard, Plaintiff alleges that "Defendants" were on notice of the alleged wrongs because Plaintiff filed grievances, which were appealed to Defendant Nadrowski, and that Plaintiff wrote letters to both Defendants asking them to investigate.  The filing of a grievance, however, is generally <u>not sufficient</u> to show the actual knowledge necessary for personal involvement, *Rode*, 845 F.2d at 1208; nor is participation in the after-the fact review of a grievance is not enough to establish personal involvement, *see*, *e.g.*, *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying deprivation); *Pressley v. Beard*, 266 F. App'x. 216, 218 (3d Cir. 2008) ("The District Court properly dismissed these [supervisory] defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); *Mincy v. Chmielsewski*, 508 F. App'x. 99, 104 (3d Cir. 2013) (An "officer's review of, or failure to investigate, an inmate's grievances

generally does not satisfy the requisite personal involvement."); *see also Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa.1997), aff'd, 142 F.3d 430 (3d Cir.1998) (stating prison officials' failure to respond to inmate's grievance does not state a constitutional claim). As such, Plaintiff's generalized allegations that Defendants Nadrowski and Golden were on notice of all alleged violations because Plaintiff appealed grievances to them or because he wrote them letters and asked them to investigate are insufficient to show that Defendants' personal involvement.

For all these reasons, the Court agrees with Defendants that Plaintiff fails to provide sufficient facts showing that supervisory Defendants Nadrowski and Golden were personally involved in the retaliatory and discriminatory acts committed by unnamed corrections staff. The Court therefore grants the motion to dismiss the First Amendment retaliation and class of one equal protection claims against Nadrowski and Golden.

**b.   Protective Custody Policy Claims Against Nadrowksi, Golden, and the County**

Plaintiff also alleges in the SAC that Defendants Nadrowski and Golden created the generally applicable protective custody policies or customs at MCCI and were deliberately indifferent to the risk to Plaintiff's health and safety presented by those policies or customs. The treatment of pretrial detainees is governed by the Fourteenth Amendment Due Process Clause and not the Eighth Amendment prohibition on cruel and unusual punishment. *See Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017) (citing *Bell v. Wolfish*, 441 U.S. 520, 551 (1979)). Nevertheless, a pretrial detainee's claims for unconstitutional prison conditions "are coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment." *Edwards v. Northampton Cty.*, No. 12-5323, 2016 WL 7654661, at *4 (E.D. Pa. Apr. 29, 2016), aff'd, 663 F. App'x 132 (3d Cir. 2016) (citing *Keller v. Cty. Of Bucks*, 209 F. App'x 201, 205 (3d Cir. 2006)). "In the Eighth Amendment context, deliberate indifference is a subjective

standard of liability consistent with recklessness as that term is defined in criminal law." *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (internal quotation marks omitted).  To act with deliberate indifference, "a defendant prison official must both know of and disregard an excessive risk to inmate health or safety."  *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2011) (internal quotation marks omitted).  A plaintiff may establish deliberate indifference by showing that the risk of harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" so that they "must have known" about the risk. *Farmer*, 511 U.S. at 842-43.

 Plaintiff seeks to hold Nadrowski and Golden responsible as policymakers who created the protective custody policies at MCCI.  As noted above, "to hold a supervisor liable...for their deficient policies...the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of [a constitutional] injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Beers-Capitol*, 256 F.3d at 133–34.  Deliberate indifference in the supervisory context may be demonstrated by "(i) showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiffs', or (ii) by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met."  *Beers-Capitol*, 256 F.3d 136-37 (citing *Sample*, 885 F.2d at 1099).

Here, Plaintiff has not pleaded sufficient facts showing that there was a pattern of past occurrences of injuries similar to Plaintiff's injuries that would have put Defendants Nadrowski and/or Golden on notice that the protective custody policies were so deficient that constitutional

injury would occur.  For instance, Plaintiff does not plead any facts to suggest that Nadrowski and/or Golden knew that protective custody inmates previously suffered from any medical ailments because the recreation area was too small to permit meaningful exercise.  Similarly, there are no allegations Defendants Nadrowski and/or Golden were on notice that twenty-three hour lockdown, noisy environment, illumination, and/or cold food in J-Unit had previously injured other protective custody inmates.  Nor does Plaintiff provide facts showing that protective custody inmates had previously complained that they were unable to prepare a defense to criminal charges due to inadequate law library resources and/or delays in receiving legal correspondence.  Moreover, none of the generally applicable protective custody policies or customs described in the SAC present the type of obvious risk of harm that would satisfy the two-part test.  Thus, Plaintiff fails to state a claim that Defendants were deliberately indifferent to the risk presented by the generally applicable protective custody polices, as described herein, and the motion to dismiss the SAC is granted as to these claims.

Plaintiff also asserts § 1983 claims against the County of Monmouth pursuant to *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The *Monell* claims fail for the same reason the policy claims against Nadrowski and Golden fail.  Like supervisory liability, municipal liability under § 1983 may not be asserted under a *respondeat superior* theory of liability but must instead be founded on allegations that the government itself supported a violation of constitutional rights.  *See Monell*, 436 U.S. at 690.  Municipal liability exists where execution of the municipality's policy or custom, whether made by lawmakers or decisionmakers whose edicts may fairly represent official policy, inflict the injury.  *Id.* at 694.

Under Third Circuit law, when a plaintiff brings a complaint under *Monell* against a municipality, the specific offending custom, policy, or practice must be pleaded in the complaint.

*See McTernan v. City of York*, 564 F.3d 636, 638 (3d Cir. 2009) ("To satisfy the pleading standard, [a plaintiff] must identify a custom or policy and specify what exactly that custom or policy was.") (citing *Philips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)).  In addition, a plaintiff must also allege that the policy or custom was the "proximate cause" of his injuries, *see Estate of Roman v. City of Newark*, 914 F.3d 789, 798 ( 3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996), "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation he alleges.  *See id.* (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).  At the pleading stage, this generally requires some facts that tend to show that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to the injuries in question.[9]  *See id.*

Here, Plaintiff does not plead sufficient facts in the SAC showing that the County was on notice through a history of prior incidents, or otherwise, that the protective custody policies at MCCI were likely to result in constitutional injuries.  Nor does Plaintiff sufficiently allege that the County made a deliberate choice to not to supervise or train its employees where the need for additional training or supervision in the face of prior incidents or where the need was obvious.

---

[9] A *Monell* claim may also be premised on a municipality's failure to train, supervise, and discipline.  To plead a claim based on failure to train (and/or supervise and/or discipline), a plaintiff "must demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'"  *Estate of Roman,* 914 F.3d at 798-800 (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)).  Deliberate indifference is plausibly pled by showing that "(1) municipal policy makers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[9] *Id.* at 798 (quoting *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011) (internal brackets omitted)).

For these reasons, the Court grants the motion to dismiss the *Monell* claim against the County of Monmouth.

### c. Conditions Amounting to Punishment under the Fourteenth Amendment

Plaintiff also asserts that his placement in protective custody under restrictive conditions for 3.5 years violated his substantive due process right to be free from punishment. *See Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017). Defendants contend that Plaintiff fails to state a claim for relief because there are no well-pleaded facts showing that Nadrowski and/or Golden kept Plaintiff in protective custody to punish him and because Plaintiff admits in his SAC that he was placed in protective custody at the recommendation of the MCPO for his own safety, which is a legitimate government purpose. In the alternative, the Defendants Nadrowski and Golden contend they are entitled to qualified immunity on these claims. The Court addresses both arguments.

It is well settled that pretrial detainees possess a constitutional right "to be free from punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). That right — as to state detainees — derives from the Due Process Clause of the Fourteenth Amendment, which protects such detainees from punishment "prior to an adjudication of guilt in accordance with due process of law." *See id.* & n.16; *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (emphasizing *Bell's* concern that pretrial detainee could not be punished "for the crime for which he was indicted via preconviction holding conditions").

Under *Bell*, a pretrial detainee can demonstrate that he was subjected to unconstitutional punishment in either of two ways: (1) by showing "an expressed intent to punish on the part of the detention facility officials," or (2) by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose. *See* 441

U.S. at 538–39; *see also Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (explaining that a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose"). "In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution." *Id.* Since *Bell*, the Third Circuit has applied the Supreme Court's teachings in a long series of decisions. *See, e.g., Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 991–92 (3d Cir. 1983); *Hubbard v. Taylor*, 399 F.3d 150, 157-68 (3d Cir. 2005) ("*Hubbard I*"); *Hubbard v. Taylor*, 538 F.3d 229, 231–36 (3d Cir. 2008) ("*Hubbard II* "); *Stevenson*, 495 F.3d at 67–69;.

The "expressed intent to punish" prong proscribes an intent to punish for the alleged crime causing incarceration prior to an adjudication of guilt. *See Bell*, 441 U.S. at 535. It also prohibits officials from subjectively seeking to punish detainees simply because they are detainees, *see id.* at 539, or on the basis of vengeful or other illegitimate interests. In *Bistrian v. Levi*, 696 F.3d 352, 363 (3d Cir. 2012), the plaintiff alleged, among other things, that counsel in his criminal case wrote to the Warden to have Bistrian removed from the SHU and informed the Warden of Bistrian's mental and physical injuries from his prior stints in administrative segregation and two prior assaults by inmates; the Warden then told Bistrian, he "would not see the light of day again[]" and also sent staff to tell Bistrian he would not be released from the SHU unless he confessed to alleged telephone infractions. *Id.* Based on these facts, the Third Circuit determined that the plaintiff plausibly alleged that Warden Levi expressly intended to punish Bistrian by placing him there after his lawyer challenged his previous confinement. In *Stevenson*, pretrial detainees alleged that they "were improperly housed in the SHU without

explanation or an opportunity to contest their placement." *Stevenson*, 495 F.3d at 66.  The Third Circuit held that the lack of adequate explanation or opportunity to contest their placement plausibly suggested that the placement was designed to punish.  *See id.*

In *Southerland v. Cnty. of Hudson*, 523 F. App'x. 919, 921–22 (3d Cir. 2013) (nonprecedential), the Third Circuit concluded that a pretrial detainee awaiting trial on first-degree murder charges who alleged that he had been confined to his cell, which he shared with another inmate, for up to 23 hours a day for a four-month period had stated a claim that his pretrial confinement constituted "punishment" in contravention of the Due Process Clause. *Id.* at 921–22.  The plaintiff in *Southerland* "asserted that he received no prior misbehavior report, disciplinary infraction, or any other documentation justifying his assignment to those conditions[.]" *Southerland*, 523 F. App'x. at 921–22.

In screening Plaintiff's original Complaint for dismissal, this Court relied on *Southerland* in proceeding Plaintiff's conditions as punishment claims.  In their motion to dismiss, Defendants argue, however, that *Southerland* is distinguishable because the plaintiff alleged that there was no valid reason for his placement in administrative segregation, and there were no allegations, as there are in Plaintiff's SAC, that Southerland was placed in protective custody <u>for his own safety</u>.

Having reviewed Defendants' arguments and the relevant law, the Court agrees that Plaintiff has not provided sufficient well-pleaded facts to suggest that Defendants Nadrowski and Golden placed Plaintiff in protective custody under restrictive conditions to punish him for committing a criminal offense or to punish him for the particular circumstances of the offense, *i.e.*, because the victim was an informant for the MCPO, or to punish him for any other improper reason.  As described above, Plaintiff allegations fail to provide sufficient well-pleaded facts

showing that Nadrowski and/or Golden were personally involved in the alleged misconduct by corrections staff.  Plaintiff also vaguely alludes to the possibility that the MCPO or its employees sought to punish Plaintiff because he was accused of killing an informant for the MCPO, but he has not sued the MCPO or any MCPO employees in his SAC.  Nor does Plaintiff provide any well-pleaded facts to suggest that Nadrowski and Golden knew that the MCPO's protective custody recommendation was a pretext to punish Plaintiff.  For these reasons, Plaintiff fails to plead sufficient facts showing that Nadrowski and/or Golden had an express intent to punish him.

Thus, the relevant questions under *Bell's* second prong are 1) whether Plaintiff's placement in protective custody for 3.5 years while he was awaiting trial was "rationally related to a legitimate nonpunitive governmental purpose and 2) whether [it] appear[s] excessive in relation to that purpose." *Bell*, 441 U.S. at 561.  Notably, in *Stevenson* and *Southerland*, there appeared to be <u>no legitimate reason</u> for placing the plaintiff in protective custody.  Defendants argue that the MCPO recommended Plaintiff be placed in protective custody for his safety and that he was provided with due process safeguards.[10]  Thus, they assert that there was a legitimate governmental purpose underlying Plaintiff's placement in protective custody.  Indeed, Plaintiff acknowledges in the SAC that he feared for his safety at MCCI and wished to be transferred to a different facility.  For these reasons, the Court finds that Plaintiff's placement in protective custody is rationally related to a legitimate nonpunitive government purpose, i.e., his safety.[11]

---

[10] Defendants also allege that Plaintiff requested to be placed in protective custody, but the SAC stops short of alleging that Plaintiff <u>asked</u> to be placed in protective custody.  It is true, however, that Plaintiff acknowledges that he feared for his safety, and he does not allege that he asked to be removed from protective custody and returned to the general population.

[11] Moreover, Defendants are not required to transfer Plaintiff to another facility where they have a legitimate nonpunitive purpose for keeping him in protective custody.  The Due Process Clause does not mandate that prison officials use the least restrictive means available to accomplish their

The Court next considers, under prong two, whether Plaintiff suffered "genuine privations and hardship over an extended period of time" such that the adverse conditions have become excessive in relation to the purposes assigned to them. *Hubbard*, 399 F.3d at 159–60. The length of time Plaintiff alleges he spent in protective custody under the restrictive conditions is concerning and raises the possibility that it may be excessive in relation to the purpose assigned to it. As explained below, however, the Court need not decide this issue because Defendants Nadrowski and Golden are entitled to qualified immunity to the extent they violated Plaintiff's Fourteenth Amendment rights by keeping him in protective custody for 3.5 years.

An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a defendant's claim of qualified immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted); *see also Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been

---

non-punitive objective. *See Bell*, 441 U.S. at 542 n.25; *see also Block v. Rutherford*, 468 U.S. 576, 590 n.10, 591 n.11 (1984) (noting that "administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives"). Indeed, the Supreme Court was careful to explain in *Bell* that "[g]overnmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional." *Bell*, 441 U.S. at 542 n.25; *see also Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (stating that the Supreme Court made clear in *Hewitt* that administrative segregation "is appropriate when necessary to incapacitate an inmate who 'represents a security threat' or to 'complet[e] ... an investigation into misconduct charges' " (quoting *Hewitt*, 459 U.S. at 476)).

violated.  If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful.").  Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address.  *See* 555 U.S. 223, 236 (2009).  The defendant official is entitled to qualified immunity if either prong is not satisfied.  *See id.* at 244-45.  Here, the Court exercises its "sound discretion" and assesses the "clearly established" prong first.  *See Pearson*, 555 U.S. at 236.

"In qualified immunity cases, [courts] accept the plaintiff's allegations as true and draw all inferences in his favor, even where, as here, a court decides only whether a right is clearly established and not whether it has been violated.  *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022).  In order for the right to be clearly established, "[then-]existing precedent must have placed the ... constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Dist. of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018).  Courts "typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional."  *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017).

Defendants argue that to the extent Plaintiff's extended placement in protective custody violated his Fourteenth Amendment substantive due process rights, they are entitled to qualified immunity because it would not have been clear to them during the period from 2012-2016 that keeping Plaintiff in protective custody under restrictive conditions for 3.5 years violated his clearly established federal rights or his rights under state law.  The Court agrees that Defendants did not have fair warning in the 2012-2016 timeframe that a pretrial detainee should not be

placed in protective custody for that length of time.  Moreover, as relevant here, Defendants would not have known they were violating Plaintiff's constitutional rights by placing him in protective custody where the prosecutor's office recommended such placement for safety reasons.

Although *Bell* and its progeny would have put prison officials on notice that pretrial detainees have a substantive due process right not to be subjected to restrictions amounting to punishment, that general proposition offers "little help in determining whether the violative nature of particular conduct is clearly established."  *See Al–Kidd*, 563 U.S. at 742 (considering general propositions in the context of Fourth Amendment violations).  Here, the general principle articulated in *Bell* does not clearly establish that a substantive due process violation would result from Plaintiff's placement in protective custody for 3.5 years based on the request of the prosecutor, which was authorized by state regulation.  The Court has not found any precedential Third Circuit and/or other circuit court decisions prior to 2016 that would have placed Defendants Nadrowski and Golden on notice that Plaintiff's placement in protective custody in restrictive conditions for 3.5 years violated his substantive due process rights.[12]

Given the lack of binding Third Circuit precedent on this issue and the lack of consensus among other circuit courts, the Court agrees with Defendants Nadrowski and Golden that they are entitled to qualified immunity on Plaintiff's substantive due process claim that his conditions

---

[12] The Court acknowledges Plaintiff's arguments that he is not able to adequately respond to Defendants' arguments due to the lockdowns and restrictions on law library access.  As such, the Court has conducted its own qualified immunity analysis and finds that the law is not clearly established.

of confinement amount to punishment.[13]  The Court therefore grants the motion to dismiss these claims on the basis of qualified immunity.

### d.  Access to the Courts and Access to his Attorney Claims

Defendants also move to dismiss Plaintiff's access to the courts and access to his attorney claims in light of his guilty plea.  Prisoners maintain a "fundamental constitutional right of access to the courts," embodied in the First and Fourteenth Amendments. *Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)).  A pretrial detainee has a right of access to the courts with respect to legal assistance and participation in preparing a defense against pending criminal charges.  *See, e.g., Prater v. City of Phila.*, 542 F. App'x. 135, 136-37 (3d Cir. 2013); *May v. Sheahan*, 226 F.3d 876, 883-84 (7th Cir. 2000).  A pretrial detainee may also raise claims alleging interference with his Sixth Amendment right to the assistance of counsel.  *Prater*, 542 F. App'x. at 137.

To prove a denial of meaningful access to the courts, Plaintiff must demonstrate (1) "'actual injury,' such as the loss or rejection of a legal claim"; and (2) that the lost or rejected legal claim is not frivolous.  *Saunders v. Phila. Dist. Attorneys Office*, 546 F. App'x. 68, 72 (3d Cir. 2013) (quoting *Oliver v. Fauver*, 118 F.3d 175, 177 (3d Cir. 1997), and citing *Monroe v. Beard*, 536 F.3d 198, 205 (3rd Cir. 2008)).  Moreover, there are two general categories of claims of denial of access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 413 (2002).

---

[13] The only court of appeals decision that appears to support the possibility that Plaintiff has a right to be free of restrictive confinement while in protective custody is *Williamson v. Stirling*, 912 F.3d 154, 163 (4th Cir. 2018), which was decided in 2018, after the timeframe at issue here. Williams spent from November 2013-June 2017, or 1300 days, in solitary confinement as a "safekeeper."  *See id.*  Relying on *Bell*, the Fourth Circuit held that Williamson's confinement violated his clearly established rights.  *Id.* at 187.  This Court need not address this decision in detail because a single out-of-circuit decision decided after the relevant time period does not show that the right is clearly established.

The first category is forward-looking claims which are prospective in nature.  *Id.*  The essence of this category of cases is that official action is frustrating the plaintiff in preparing or filing suit at the present time.  *Id.*  The opportunity to litigate "has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.*

The second category is backward-looking claims which are retrospective in nature. *Id.* at 413-14.  These cases do not look forward to future litigation, "but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable."  *Id.* at 414 (footnotes omitted).  "The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.*

Plaintiff alleges in his SAC that he is unable to prepare a defense to the criminal charges pending against him due to inadequate access to research and legal materials in protective custody, delays in communicating with his attorney, and a lack of privacy when meeting with his attorney in the restrictive case.  Later, when he was provided a classroom to meet with his attorney, Plaintiff complains that he was shackled and not permitted to approach his attorney and review documents in his case, impeding his ability to prepare a defense.

Defendants contend that Plaintiff's access to the courts and access to his attorney claims fail because he has since pleaded guilty to the pending charges.  The Court takes judicial notice of the fact that Plaintiff has since pleaded guilty to the underlying criminal charges against him, thus mooting any possible claims for injunctive relief to allow him to prepare his defense.

In addition, Plaintiff's allegations that he was unable to prepare an adequate defense to the criminal charges against him would necessarily imply the invalidity of Plaintiff's guilty plea. Thus any remaining claims for damages arising from the denial of access to the courts or his attorney are not permitted unless the underlying conviction is overturned.  *See Heck v. Humphrey*, 512 U.S. 477 (1994).  Although the Court previously permitted Plaintiff's access to his attorney and access to the court claims in connection with his criminal case to proceed, the Court agrees with Defendants that these claims are now foreclosed by his guilty plea in his criminal case.  *See, e.g., Ward v. Aviles*, No. 11-6252, 2016 WL 1461753, at *5 (D.N.J. Apr. 13, 2016) (Plaintiff's access to the courts and access to his attorney claims, if successful, would likewise imply that his guilty plea for aggravated arson is invalid).

The Court will therefore grant the motion to dismiss on the First and Fourteenth Amendment access to the court claims and the Sixth Amendment access to attorney claims.

### e.  **The Court Denies Plaintiff's Request for Counsel and Further Amendment**

Finally, the Court denies Plaintiff's request for counsel because it has granted, in its entirety, Defendants' motion to dismiss the SAC.  Having provided Plaintiff with an opportunity to amend his complaint and having dismissed Plaintiff's SAC as to all Defendants, the Court also declines to provide further leave to amend.  At this time, the Court will dismiss the § 1983 claims with prejudice as to all Defendants.

### IV.  <u>CONCLUSION</u>

For the reasons explained in this Opinion, the Court grants the Moving Defendants' motion to dismiss the SAC, denies Plaintiff's request for counsel, and denies further leave to amend.  An appropriate Order follows.

Dated: 1/10/2023

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge